**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KELECHI ONWUMERE,** | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **CLARK HILL PLC, KIMBERLY** | § | |
| **SUMNER MOORE, AND JOHN DEAN** | § | |
| **ERMANNI** | § | |
| *Defendants*. | § | |

**PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

## I.    INTRODUCTION

Plaintiff Kelechi Onwumere ("Plaintiff"), files this Original Petition against Defendant Clark Hill PLC ("CH") and Individual Defendants Kimberly Sumner Moore ("Moore") and John Dean Ermanni ("Ermanni"), (referred to hereinafter as "Individual Defendants") (all collectively referred to as "Defendants"), and would respectfully show the Court as follows:

## II.    PARTIES

1.    Plaintiff is an individual residing in Texas.

2.    Defendant CH is a foreign limited liability company authorized to do business in the state of Texas, with its principal place of business in Texas located at 2600 Dallas Pkwy #600, Frisco, Texas 75034, where Plaintiff was employed. CH may be served by and

through its registered agent Jadd F. Masso at 901 Main Street, Suite 6000, Dallas, Texas 75202, or wherever he may be found.

3. Defendant Moore, a Caucasian female, is an individual who served as a Member at CH and worked in Texas during the time period relevant to this lawsuit. She may be served with process at 5633 Lindsey Drive, Plano, Texas 75093, or wherever she may be found.

4. Defendant Ermanni, a Caucasian male, is an individual who served as the Labor and Employment Business Unit Director at CH and worked in Michigan during the time period relevant to this lawsuit. He may be served with process at 17308 Lorraine Dr., Macomb, Michigan 48044, or wherever he may be found.

## III.     JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1331, because Plaintiff's claims arise under federal law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims.

6. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## IV.     STATEMENT OF FACTS

7. Plaintiff is a licensed Texas attorney.

8. Plaintiff graduated Summa Cum Laude from law school.

9. Plaintiff sat for the Texas bar one time in July 2017 and received her law license shortly thereafter in November 2017.

10. Plaintiff is an African American woman of Nigerian descent and has brown skin.

11. At all times relevant to the claims herein, Defendants were aware of Plaintiff's race, national origin, skin tone, and sex.

12. In September 2023, Plaintiff applied for a Labor and Employment attorney role with Defendant CH.

13. In September 2023, Plaintiff received an email from Defendant CH's legal recruiter Audrey Wyech ("Ms. Wyech") requesting an interview for the role.

14. During the interview and at a time thereafter, Ms. Wyech told Plaintiff the role would primarily encompass litigation work.

15. In September 2023, Plaintiff completed her first video interview with Defendant Ermanni.

16. During that interview, Defendant Ermanni represented that he would oversee Plaintiff's onboarding, monitor her workload, and ensure she received adequate support and resources as she transitioned into the role. He further represented that the Labor and Employment section had the structure, systems, and support necessary for Plaintiff to be properly integrated.

17. Plaintiff relied on these representations because they were material to her decision to leave a stable, long-term position and return to litigation practice.

18. Defendant Ermanni's assurances mirrored those later made by Defendant Moore, reinforcing the illusion of a coordinated and supportive environment that did not exist for Plaintiff.

19. In October 2023, Plaintiff interviewed virtually with Defendant Moore and Laura Calhoun ("Ms. Calhoun"), both Members of the firm.

20. Defendant Moore was a Member, the Member in Charge of the Collin County office, and the Business Unit Leader for the Labor and Employment section.

21. In her capacity as Member in Charge of the Collin County office, Defendant Moore was responsible for overseeing the operations of that office, including remaining updated on law clerks, attorneys, and staff, coordination of litigation activities, and oversight of professional development and office-wide initiatives.

22. In October 2023, Plaintiff completed her third video interview with a senior attorney on Defendant Moore's team.

23. On November 3, 2023, Defendant Moore extended an offer of employment to Plaintiff for a Labor and Employment attorney role with Defendant CH.

24. The acceptance deadline for the offer was November 10, 2023.

25. On November 8, 2023, Plaintiff requested an extension to the offer, as she communicated that she was interviewing with other employers.

26. Defendant Moore extended the acceptance deadline for the offer to November 20, 2023.

27. On November 13, 2023, during the extension period, Defendant Moore asked Plaintiff if the two of them could meet at the Collin County office then go to lunch, to which Plaintiff agreed.

28. Defendant Moore and Plaintiff met for lunch on November 15, 2023.

29. During lunch, Plaintiff reiterated to Defendant Moore that she had other job opportunities.

30. Plaintiff also expressed how critical it was for her to select the most suitable role for her, given that she was anticipating leaving a Fortune 10 Company she had been successful at for over five years, was fully remote, had autonomy, and no billable hour requirements.

31. Plaintiff also reiterated that she was seeking this new opportunity to re-engage her litigation practice as she had been managing pre-litigation matters for over five years.

32. In response, Defendant Moore warranted that she would provide Plaintiff with thoughtful mentorship.

33. Defendant Moore represented that Plaintiff would have unlimited paid-time-off and could work remotely as needed.

34. She further represented that the firm maintained a comprehensive training program designed to ensure newly hired attorneys were acclimated quickly.

35. Defendant Moore emphasized that the firm was inclusive and fostered a work environment grounded in mutual respect for all.

36. Defendant CH also advertised its status as a Mansfield Certified firm, representing that it actively promoted diversity, equitable access to opportunities, and inclusive development for minority attorneys.

37. Defendant Moore assured Plaintiff that she would personally guide her through billing practices, given it would be Plaintiff's first experience billing hours.

38. Defendant Moore added that she was nearing retirement and intended to transition her book of business to Plaintiff after mentoring her and familiarizing her with the firm's process flows and protocols.

39. Following the lunch meeting, Defendant Moore agreed to, and did, increase Plaintiff's offered compensation for the role.

40. Defendant Moore initiated the lunch meeting with Plaintiff and made these representations and compensation adjustments to secure Plaintiff's acceptance of the offer.

41. Relying on these representations, Plaintiff accepted the Labor and Employment attorney role with Defendant CH on November 20, 2023.

42. Defendant Moore knew Plaintiff forewent other employment opportunities in reliance on these representations.

43. Plaintiff also resigned from her role at the Fortune 10 Company.

44. Before Plaintiff began her employment, Defendant CH was aware that she was a licensed Texas realtor.

45. After Plaintiff accepted the offer, Defendant CH informed her that she would be required to limit her realtor services during her employment.

46. This restriction was not discussed during Plaintiff's recruitment or at the time the offer was extended, despite Defendant CH's prior knowledge of her active licensure.

47. Shortly thereafter, Plaintiff began her employment with Defendant CH as a Labor and Employment Attorney on January 29, 2024, one of the start dates the firm offered her.

48. Plaintiff worked onsite at Defendant CH's Collin County office located at 2600 Dallas Pkwy #600, Frisco, Texas 75034.

49. Plaintiff generally worked between eight to 12 hours a day, Monday through Friday, and at times, throughout the weekend.

50. Defendant Moore's Labor and Employment team consisted of Defendant Moore and Ms. Calhoun, both firm Members, a male senior attorney, and Plaintiff, the only associate attorney on the team.

51. At the time her employment began, Plaintiff was the only female attorney at the associate level in the Collin County office, and all other associates in the same office were male.

52. Plaintiff was also the only African American attorney assigned to the Collin County office.

53. At all relevant times, African American attorneys comprised less than 5% of Defendant CH's attorney population.

54. Within the first few weeks of Plaintiff's employment, an African American female attorney employed in Defendant CH's Los Angeles, California office resigned, further reducing the number of African American attorneys at the firm.

55. Defendant Moore regularly engaged and collaborated with Ms. Calhoun and the senior attorney but did not extend the same engagement or support to Plaintiff.

56. Despite being advised of the correct pronunciation of Plaintiff's name multiple times, Defendant Moore repeatedly mispronounced it.

57. Defendant Moore shared the improper pronunciation of Plaintiff's first name with several other employees in the Collin County office.

58. Because of Defendant Moore's inaccurate pronunciation of Plaintiff's first name, Plaintiff's colleagues in the Collin County office also mispronounced it on multiple occasions.

59. When Plaintiff corrected Defendant Moore's pronunciation, Defendant Moore acted dismissively and behaved as though Plaintiff was overreacting.

60. When Defendant Moore grew tired of pronouncing Plaintiff's first name, she began calling her "K."

61. Plaintiff never authorized Defendant Moore to call her "K."

62. Defendant Moore never asked Plaintiff if she could call her "K."

63. Shortly after, Plaintiff added a phonetic spelling of her name to her firm email signature.

64. Plaintiff added a phonetic spelling of her name to her firm email signature due to her name being mispronounced by Defendant Moore on multiple occasions.

65. Despite adding the phonetic spelling and repeatedly correcting Defendant Moore, the mispronunciations continued.

66. On one occasion, during an eight-hour mediation in the second month or so of Plaintiff's employment, Defendant Moore mispronounced Plaintiff's first name so many times that the claims adjuster and mediator, who had initially pronounced it correctly, began mispronouncing it as well, reflecting the lack of respect Defendant Moore modeled toward Plaintiff.

67. Having repeatedly mispronounced Plaintiff's name and made no effort to learn it, Defendant Moore began avoiding its use altogether by directing questions toward Plaintiff in group settings without naming her, forcing Plaintiff to ask whether the question was directed at her.

68. Consistent with this unsupportive pattern, Defendant Moore provided no guidance or orientation at the outset of or during Plaintiff's employment.

69. On Plaintiff's first day of work, before any form of onboarding, Defendant Moore assigned her a case without providing any substantive background on the matter.

70. When Plaintiff asked Defendant Moore how to retrieve information related to the case assignment, Defendant Moore told her to figure it out.

71. Defendant Moore did not provide any resources or contacts for Plaintiff to engage for onboarding.

72. The firm's training was limited to technology and software use, not substantive case management or internal team process flows.

73. It did not include instructions or guidance on how cases were to be managed or staffed, as that was Member specific.

74. It did not cover billing guidelines, litigation protocols, or internal processes.

75. No guidance was provided to clarify Defendant Moore's expectations for the role.

76. At no time did Defendant Moore meet with Plaintiff to explain the layout of her team, her expectations, or the firm's processes.

77. Defendant Moore also never explained how the assigned paralegal was to be utilized to promote efficiency.

78. Plaintiff had to draft her own templates before beginning assignments and calendar her own deadlines, tasks that were non-billable, time-consuming, and uncustomary for a law firm of Defendant CH's size.

79. Acknowledging the disorganization, Defendant Moore apologized to Plaintiff, stating Plaintiff began employment with Defendant CH at a busy time.

80. Even with the apology, Defendant Moore continued to overlook Plaintiff.

81. Absent Plaintiff's termination and request for a meeting in August 2024, at no time during Plaintiff's employment did Defendant Moore initiate even one formal meeting to assist Plaintiff with transitioning into her role.

82. Plaintiff was expected to figure out the firm and its protocols on her own.

83. Other Members in the Collin County office held regular one-on-one meetings with newly hired attorneys, including weekly, bi-weekly, or monthly check-ins.

84. Though Plaintiff's employment began on January 29, 2024, Defendant Moore did not add her into the team's text message group chat until approximately six months later when Plaintiff discovered the group chat existed and specifically requested to be included.

85. With the exception of termination-related and demeaning communications, all communications with Defendant Moore were initiated by Plaintiff.

86. When Plaintiff sought clarification regarding her assignments, Defendant Moore would at times end conversations mid-discussion and walk away.

87. Efforts by Plaintiff to schedule or initiate meetings were met with dismissal as Defendant Moore often closed her office door or refused to engage.

88. Defendant Moore assigned cases to Plaintiff but restricted her ability to contact clients, withheld relevant notes and prior communications, and failed to provide any information necessary for Plaintiff to effectively manage her assignments.

89. As Defendant Moore offered no insight or direction on Plaintiff's assigned cases, she instead instructed Plaintiff to search the files to learn about them herself.

90. When Plaintiff attempted to review the case files to understand the cases, Defendant Moore criticized the billing time recorded for doing so.

91.  During brief exchanges in Defendant Moore's office, Defendant Moore would rush Plaintiff out or appear visibly irritated by her presence.

92.  Plaintiff often worked quietly in her office with natural sunlight, rather than overhead lighting, as she told Defendant Moore she found it less harsh and more conducive to focus.

93.  Defendant Moore repeatedly stood at Plaintiff's office doorway silently watching her until Plaintiff noticed, at which point she pretended to be merely walking by.

94.  On at least one occasion, Defendant Moore barged into Plaintiff's office unannounced, abruptly flipped on the harsh overhead lights, searing Plaintiff's eyes, and threw documents onto her desk.

95.  When Defendant Moore communicated with Plaintiff, it was often in an abrupt and dismissive manner, showing little regard for professional courtesy or collaboration.

96.  Since Defendant Moore was not supporting Plaintiff and treating her poorly, in March 2024, less than two months after Plaintiff's employment began, she contacted Defendant CH's Business Development Manager Mary McGinnis ("Ms. McGinnis"), to inquire about attending educational seminars and conferences.

97.  Ms. McGinnis directed Plaintiff to Defendant Ermanni and he failed to provide any meaningful resources.

98.  In Plaintiff's interview with Defendant Ermanni, he warranted that he was to oversee Plaintiff's case load to ensure she had enough work and was onboarded properly.

99.   Defendant Ermanni admittedly did nothing of the sort.

100.  Continuing to endure a hostile work environment, in April 2024, Plaintiff contacted Defendant Moore once more to respectfully request support,  and, instead of providing

Plaintiff with the proper tools or directing Plaintiff to appropriate resources, Defendant Moore responded by asking Plaintiff what she wanted her to do.

101. Meanwhile, as the Member in Charge of the Collin County office who exercised control and influence over the office and attorney development opportunities, Defendant Moore did not provide Plaintiff access to trials, depositions, hearings, or arbitrations, while non-African American male associates, and even summer associates, received such opportunities from other Members who did not serve as Member in Charge.

102. On several occasions, Defendant Moore copied the assigned paralegal on emails where she spoke to Plaintiff in a demeaning or unprofessional tone, undermining Plaintiff's authority and diminishing her standing on the team.

103. For example, in April 2024, Defendant Moore told Plaintiff she needed to write the way she speaks, a demeaning remark that reflected biased assumptions about Plaintiff's professionalism and communication style as an African American woman of Nigerian descent.

104. It was likewise common for Defendant Moore to "accidentally" exclude Plaintiff from email communications about matters Plaintiff was managing or "forget" to include her altogether, while still holding Plaintiff accountable for the corresponding deadlines and deliverables.

105. In communications directed to Plaintiff, Defendant Moore issued inconsistent and contradictory directives, misdirected emails concerning Plaintiff's assignments, and altered instructions after Plaintiff had already begun work, repeatedly disrupting Plaintiff's workflow in a manner not imposed on others.

106. For example, on one occasion, Defendant directed Plaintiff to complete an Employee Handbook for a client at any time when Plaintiff's workload was getting low. Defendant Moore stated the client would not need it for several months and that the last one took almost a year to complete. Defendant Moore later expedited the assignment prompting Plaintiff to work on it extensively, only to subsequently state that the Handbook needed to be broken into state-specific addendums instead. Defendant Moore stated she had yet again "forgotten" to inform Plaintiff that another team had recently completed a Handbook from which Plaintiff could have obtained the necessary state-specific updates without conducting her own research.

107. Defendant Moore later revisited the same Handbook assignment, stating she discussed it with her husband, a non-employee attorney, who told her he would never spend the amount of money Plaintiff billed on a Handbook.

108. As another example, Defendant Moore advised Plaintiff that discovery requests and responses could not be served by email. When Plaintiff informed Defendant Moore that opposing counsel had expressly consented to such service, Defendant Moore withdrew her challenge.

109. Consistent with this ongoing pattern, Defendant Moore told Plaintiff that she did not like having meetings and declined to schedule regular one-on-one meetings with her.

110. Growing weary with wasted time, the amount of demands, and no support, in May 2024, Plaintiff contacted Ms. Wycech to raise concerns about the lack of support and training she was receiving from Moore in comparison to others.

111. During Plaintiff's interview process, Ms. Wycech told her the firm had a robust training program and several resources of support.

112. Ms. Wycech acknowledged that based on her knowledge of other firm Members, Defendant Moore's behavior deviated from that of other firm Members.

113. Because of this, Ms. Wycech connected Plaintiff to Defendant CH's Director of Professional Development, Lauren Sager ("Ms. Sager").

114. In May 2024, Plaintiff met with Ms. Sager.

115. During the meeting, Ms. Sager told Plaintiff the firm had been working to address serious deficiencies in its training program, in stark contrast to the robust program Defendant Moore represented during recruitment to secure Plaintiff's employment.

116. At that time, Plaintiff grew increasingly concerned, as she had been employed with the firm for more than three months and had still not received the meaningful training or guidance Defendant Moore and Defendant Ermanni represented to secure her acceptance of the role.

117. Though Ms. Sager promised to follow up with Plaintiff the following week after speaking with Defendant Ermanni, she never did.

118. Plaintiff initiated follow up with Ms. Sager once more in May 2024 and though Ms. Sager stated again that she would contact Defendant Ermanni once more and follow back up with Plaintiff, she never did.

119. As Plaintiff continued to wait for follow up from Ms. Sager, Defendant Moore continued to assign more cases with no guidance, prompting Plaintiff to bypass Ms. Sager and initiate contact with Defendant Ermanni directly for the second time in August 2024.

120. Defendant Ermanni stated that he had received nothing but good feedback about Plaintiff and her work.

121. This was consistent with general feedback from Defendant Moore, despite how difficult it was for Plaintiff to understand what was required of her.

122. Plaintiff told Defendant Ermanni that she was not receiving meaningful development or mentorship and, without structured guidance, was forced to independently navigate the firm's practices and expectations, as compared to other attorneys.

123. Plaintiff also told Defendant Ermanni that when she worked remotely, Defendant Moore ceased communicating with her and reassigned her pending matters to other attorneys, despite having represented that Plaintiff could work remotely as needed, while other attorneys were not subjected to the same treatment.

124. Defendant Ermanni agreed that Plaintiff should have been able to work remotely or take time off as needed.

125. Nevertheless, when Plaintiff worked from home, Defendant Moore reassigned Plaintiff's pending work to the male senior attorney on the team or others.

126. Defendant Ermanni again provided no meaningful support and apologized to Plaintiff for failing to check in with her after six months of employment, despite his prior representations that he would oversee her onboarding and ensure she received adequate support.

127. Defendant Ermanni shared that he would look into Plaintiff's concerns and have a follow up meeting with Plaintiff a little over a week later.

128. Defendant Ermanni also asked Plaintiff to send him a recap email of her concerns.

129. The next day, Plaintiff sent Defendant Ermanni a recap of her complaints and actions she was proactively taking to resolve them.

130. Through her recap and prior escalations, Plaintiff repeatedly communicated that she was being treated differently and subjected to demeaning and isolating conduct as compared to others on the team, including exclusion from opportunities and lack of support.

131. Despite being repeatedly placed on notice, Defendant Ermanni did not take any steps to escalate Plaintiff's internal workplace concerns to HR, even though he served as President of the firm's external HR consulting subsidiary.

132. Attempting once more to resolve Defendant Moore's gaps in communication in a resolution-oriented manner, Plaintiff emailed Ms. Moore once more on that same day, for clarification of her job responsibilities and a clear understanding of Defendant Moore's vision of her role.

133. Defendant Moore did not respond to the email.

134. In August 2024, Plaintiff met with Defendant Moore and Ms. Calhoun.

135. Defendant Moore opened the meeting stating it was Plaintiff's meeting and begrudgingly asked her what she wanted to discuss.

136. During that meeting, neither Defendant Moore nor Ms. Calhoun provided any negative feedback about Plaintiff.

137. Plaintiff reiterated that she transitioned from her previous Company to re-engage with litigation and was being intentional about utilizing her time at the firm productively.

138. Plaintiff reminded Defendant Moore and Ms. Calhoun that she took the role at the firm for that purpose.

139. Plaintiff shared that she had been with the firm for six months and did not feel she was being invested into like others, as evidenced by her having to initiate the six-month check-in meeting.

140. Defendant Moore told Plaintiff to keep working and keep being efficient.

141. Plaintiff showed Defendant Moore and Ms. Calhoun a print out of a local trial bootcamp and asked if she could participate in that and also visit some local trials, to which they both agreed.

142. In fact, Defendant Moore shared that she brought the same print out of the trial bootcamp to the meeting to encourage Plaintiff to sign up for it.

143. Plaintiff made this request after she had not been included in any hearings or trials conducted by Defendant Moore.

144. The meeting concluded with both Defendant Moore and Ms. Calhoun permitting Plaintiff to look outside of the firm for resources since she was not receiving them internally.

145. Around that time, Defendant Moore permitted Plaintiff to draft a deficiency letter on her own letterhead and independently manage a meet and confer.

146. In August 2024, Plaintiff met with Defendant Ermanni as a follow up to their last discussion.

147. Plaintiff reiterated her prior concerns and told Mr. Ermanni that she was still attempting to obtain the support other attorneys were receiving.

148. Defendant Ermanni told Plaintiff that it was not Defendant Moore's responsibility to adapt to her and Plaintiff would need to adjust to Defendant Moore's treatment of her.

149. Defendant Ermanni told Plaintiff he would follow up with resolve.

150. Defendant Ermanni never followed up.

151. Instead, 28 days later in September 2024, Defendant Moore terminated Plaintiff's employment.

152. In that termination meeting, Defendant Moore dishonestly told Plaintiff that although Plaintiff was interested in litigation work, Defendant Moore had not participated in a trial or hearing in years.

153. Defendant Moore personally participated in at least one hearing and one trial during Plaintiff's employment.

154. Nevertheless, Defendant Moore told Plaintiff to spend the next 30 days looking for another job.

155. Following the termination meeting, Defendant Moore attempted to engage Chief Human Resources Officer Kathleen Sullivan ("Ms. Sullivan"), a Caucasian female, regarding a proposed separation agreement for Plaintiff.

156. When Plaintiff later spoke with Ms. Sullivan, Ms. Sullivan acknowledged that she had never been informed of the concerns Plaintiff raised with Defendant Ermanni regarding Defendant Moore.

157. Despite publicly holding himself out as an HR-strategy expert through his leadership of the firm's HR consulting subsidiary, Defendant Ermanni did not escalate Plaintiff's concerns to Human Resources.

158. In this initial discussion, Ms. Sullivan told Plaintiff she was being terminated for poor performance.

159. Taken aback, Plaintiff notified Ms. Sullivan of the concerns she had previously raised with Defendant Ermanni, Ms. Sager, and others, and Ms. Sullivan changed the employment termination reason to not prioritizing the firm.

160. Plaintiff consistently prioritized her work by escalating her need for support to carry out her assignments, though support was never provided.

161. Plaintiff routinely worked extended hours, including evenings and weekends, in an effort to meet expectations and complete her assignments.

162. Plaintiff never received any formal disciplinary actions or coaching during her employment with Defendant CH.

163. Plaintiff was never formally notified of any attendance issues.

164. Plaintiff was never formally notified of any behavioral issues.

165. Plaintiff was never formally notified of any performance issues.

166. Plaintiff consistently sought the resources and support necessary to perform her job effectively and raised concerns about being treated differently from other attorneys, but was penalized through termination for doing so.

167. Ms. Sullivan acknowledged that Plaintiff was a bright and hardworking attorney but stated that Defendant Moore held significant authority within the firm and there was little that could be done.

168. Ms. Sullivan's statements reflected that Defendant Moore effectively controlled personnel decisions on her team and faced no meaningful internal checks on her treatment of Plaintiff.

169. Following the termination meeting but before the effective date, Defendant Moore continued to contact Plaintiff for assistance with pending matters, and Plaintiff provided that assistance.

170. Plaintiff also continued working on assignments with other attorneys at the firm and received positive feedback on those assignments.

171. Before the effective date of Plaintiff's termination, Defendant Moore directed firm personnel to remove Plaintiff's name from her office door, prompting several firm employees to contact Plaintiff to ask whether she had been terminated.

172. In October 2024, before Plaintiff's employment ended, Defendant CH reposted a similar position on Defendant Moore's team requiring two additional years of experience and offering part-time arrangements.

173. In October 2024, before Plaintiff's employment ended, Defendant CH activated an automated reply on Plaintiff's email account stating she was no longer employed by the firm.

174. Defendant Moore repeatedly inquired about Plaintiff, where she was working, and if she executed the separation agreement.

175. In April 2025, Defendant Moore hired a non-African American senior attorney to join her team.

176. As a result of Defendants' conduct, Plaintiff suffered economic and professional harm, including loss of income and benefits, loss of her former corporate role, interruption of career progression, out-of-pocket losses, reputational injury, and other consequential damages.

## V.    CONDITIONS PRECEDENT

177. Pursuant to the workshare agreement between the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC"), Plaintiff has satisfied all conditions precedent to filing this lawsuit and has filed this action within ninety (90) days of receiving the Notice of Right to Sue.

## VI.    CAUSES OF ACTION

**COUNT I: RACE DISCRIMINATION AND HARASSMENT UNDER 42 U.S.C. § 1981 (AGAINST DEFENDANTS)**

178. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

179. Defendants discriminated against Plaintiff because of her race and subjected her to harassment and a hostile work environment. Among other actions, Defendant Moore persistently demeaned, ostracized, undermined, and targeted Plaintiff through repeated mispronunciations of her name, exclusion from communications, denial of training, disparate access to opportunities, and demeaning commentary. Defendant Ermanni further ratified Defendant Moore's conduct by excusing and disregarding Plaintiff's complaints. Plaintiff was the only African American attorney in the office and was treated less favorably than non-African American attorneys, including male associates and summer associates who received meaningful engagement, trial opportunities, and mentorship that was denied to Plaintiff. Defendant CH posted a job opening for Plaintiff's role while Plaintiff was still in it and later replaced her by re-leveling the position as a senior role to hire a non–African American attorney. Plaintiff was treated less favorably in the terms, conditions, and privileges of her employment despite her credentials, experience, and performance.

180. Defendants are directly liable for their discriminatory and harassing conduct.

181. Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

**COUNT II: RETALIATION UNDER 42 U.S.C. § 1981 (AGAINST DEFENDANTS)**

182.  Plaintiff hereby repeats and realleges the allegations in each of the paragraphs as if fully set forth herein.

183.  Plaintiff's repeated escalations concerned differential and demeaning treatment in circumstances implicating race-based disparities including disparate treatment as compared to non-African American attorneys. Plaintiff engaged in protected activity by opposing and reporting this racially biased treatment to Defendant Moore, Defendant Ermanni, the firm's professional development personnel, and others, including through written and verbal communications. Defendants were aware of the nature of Plaintiff's concerns and, rather than addressing them, repeatedly promised follow-up and support that never occurred, and ultimately subjected Plaintiff to adverse actions, including further isolation, withholding of resources, reassignment of her work, undermining her role, and terminating her employment shortly after she renewed her complaints to Defendant Ermanni.

184.  Defendants are directly liable for their retaliatory conduct as it impacted the terms and conditions of Plaintiff's employment.

185.  Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

**COUNT III: RACE, COLOR, AND NATIONAL ORIGIN DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (AGAINST DEFENDANT CH)**

186.  Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

187. Plaintiff, an African American woman of Nigerian descent with brown skin, was subjected to discrimination based on her race, color, and national origin. Among other actions, Defendant Moore repeatedly mispronounced Plaintiff's name, refused to learn it, avoided addressing Plaintiff by name, excluded Plaintiff from case-related communications, denied her access to mentorship and resources provided to non-African American attorneys, and subjected her to a pattern of belittlement and degradation that non-African American attorneys did not experience. Defendant CH further replaced Plaintiff with a non-African American female attorney and treated her less favorably in the terms, conditions, and privileges of employment despite her qualifications. Defendant CH is therefore liable for the acts of its agents.

188. The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

### COUNT IV: SEX DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (AGAINST DEFENDANT CH)

189. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

190. Plaintiff, as the only female associate at the time, was treated differently than her male counterparts. Among other things, male associates were invited to trials, hearings, arbitrations, depositions, and other developmental opportunities, while Plaintiff repeatedly requested these same experiences but was denied them. Plaintiff was also held to stricter standards, subjected to heightened scrutiny, and deprived of support and mentorship regularly offered to male attorneys.

191. This discriminatory treatment created intolerable conditions and culminated in Plaintiff's termination. Defendant CH is therefore liable for the acts of its agents.

192. The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT V: HARASSMENT AND HOSTILE WORK ENVIRONMENT UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (AGAINST DEFENDANT CH)

193. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

194. Plaintiff was subjected to a hostile work environment that included, but is not limited to, persistent mispronunciation of her name, exclusion from critical communications, intimidation, a lack of respect, withholding of resources, belittling remarks, professional sabotage, and intentionally demeaning conduct within view of her colleagues. This included exclusion from team communications, reassignment of her work when working remotely, public undermining in front of colleagues, denial of access to client contact and case information necessary to perform her role, and the removal of her name from her office door while she was still employed. These actions were severe and pervasive enough to alter the conditions of Plaintiff's employment and Defendant CH is therefore liable for the acts of its agents.

195. The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT VI: RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (AGAINST DEFENDANT CH)

196. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

197. Plaintiff engaged in protected activity by opposing and reporting differential and demeaning treatment based on her race, color, national origin, and sex to Defendant Moore, Defendant Ermanni, the firm's professional development department, and others, through written and verbal communications. Defendant CH was aware of the nature of Plaintiff's concerns and, rather than addressing them, escalated adverse actions against her, including reassigning her cases, ignoring her communications, excluding her from opportunities, manufacturing a false narrative regarding her commitment to the firm, and ultimately terminating her employment shortly after she renewed her complaints. Defendant CH is therefore liable for the acts of its agents.

198. The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT VII: FRAUDULENT INDUCEMENT (AGAINST DEFENDANTS)

199. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

200. Defendant Moore knowingly and intentionally made false representations to Plaintiff during recruitment concerning existing firm conditions and her present ability and intent to perform, including representations regarding the existence of onboarding processes and mentoring practices that were represented as already in place, that Defendant CH had structured mentorship and training systems in place, that Plaintiff would perform

litigation work, and that remote work flexibility and unlimited paid-time-off were available as represented. These representations were material, made to secure Plaintiff's acceptance of the position, and false when made. These representations concerned existing conditions and present capabilities, not future aspirations or generalized statements about workplace culture.

201. Defendant Moore initiated a personal recruitment lunch, increased Plaintiff's salary offer, and made repeated assurances despite knowing at the time that she lacked both the capacity and intent to mentor Plaintiff and that no structured onboarding or training program existed as represented. Defendant Moore's statements were false and misleading when made and were communicated with the intent that Plaintiff rely on them. These misrepresentations were made at the November 15, 2023 lunch meeting and in communications between approximately November 3 and November 20, 2023, for the purpose of inducing Plaintiff to accept the role.

202. Defendant Ermanni likewise made false representations during Plaintiff's recruitment concerning his present role and responsibilities, including that he was responsible for overseeing onboarding, monitoring attorney workload, ensuring adequate work and support, and facilitating integration within the Labor and Employment team. These statements were material, were made during Plaintiff's interview in October 2023, and were false when made, as Defendant Ermanni did not intend to and admittedly did not provide such oversight or support. Plaintiff reasonably relied on these representations in accepting employment. Defendants are therefore liable for these fraudulent acts.

203. Plaintiff reasonably relied on these representations and accepted the position to her detriment, including by resigning from a secure Fortune 10 position she held for 5.5 years that she would not have left absent Defendants' misrepresentations.

204. As a direct and proximate result, Plaintiff suffered substantial economic, professional, and personal harm.

**COUNT VIII: NEGLIGENT MISREPRESENTATION (AGAINST DEFENDANTS)**

205. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

206. Defendant Moore, acting within the scope of her employment, failed to exercise reasonable care or competence in obtaining or communicating information during recruitment regarding existing firm practices and systems, including information concerning conditions and structures represented as already in place at the firm, the existence and availability of onboarding processes, training resources, supervisory support structures, workflow expectations, and professional development infrastructure that were represented as already in place at Defendant CH. Plaintiff justifiably relied on this information when accepting employment.

207. Defendant Ermanni likewise failed to exercise reasonable care or competence in obtaining or communicating information during recruitment regarding the firm's existing onboarding and supervisory structure, including representations concerning the availability of oversight, workload management practices, and support systems in place for attorneys transitioning into the Labor and Employment team. Plaintiff justifiably relied on this information when accepting employment. Defendants are therefore liable for these negligent acts.

208. Plaintiff suffered pecuniary losses, including economic and professional losses, as the direct and proximate result of relying on these misrepresentations.

## COUNT IX: PROMISSORY ESTOPPEL (AGAINST DEFENDANT CH, IN THE ALTERNATIVE)

209. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

210. Defendant CH, through its agents, made specific and definite promises to Plaintiff during recruitment and prior to the commencement of her employment, including representations concerning structured mentorship, comprehensive onboarding, consistent guidance, professional development opportunities, and remote work flexibility, which were collateral to Plaintiff's employment. Defendant CH reasonably and foreseeably expected Plaintiff to rely on these promises.

211. Plaintiff reasonably and detrimentally relied on these promises by foregoing other employment opportunities, resigning from a secure prior position, and accepting employment with Defendant CH. Defendant CH is therefore liable for the acts of its agents.

212. Plaintiff's reliance was substantial, foreseeable, and resulted in concrete detriment, and injustice can be avoided only by enforcing Defendants' promises to the extent necessary to remedy Plaintiff's reliance-based harm.

213. This claim is pled in the alternative to any argument that no enforceable contractual remedy exists with respect to these promises.

## VII.   DAMAGES

214. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

215. Defendants' actions violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981, and 42 U.S.C. § 1981a. As a result of these violations, Plaintiff is entitled to all available legal and equitable relief, including back pay, front pay, compensatory damages, and pre-judgment and post-judgment interest.

216. Plaintiff is entitled to compensatory damages under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1981a(a)(1), including but not limited to, damages for non-pecuniary harms.

217. Because Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to punitive damages under 42 U.S.C. § 1981a(b)(1).

218. Plaintiff further seeks all damages, equitable relief, and remedies available under federal and state law, including damages arising from Defendants' fraudulent inducement, negligent misrepresentation, promissory estoppel, and all losses proximately caused by Defendants' false representations and promises.

## VIII.   ATTORNEYS' FEES AND COSTS

219. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

220. Plaintiff retained the services of undersigned counsel to prosecute her claims.

221. Plaintiff is entitled to recovery of reasonable attorneys' fees, expert fees, and costs to the fullest extent permitted by law.

## IX.   PRESERVATION OF EVIDENCE

222. Defendants are on notice of their obligation to preserve all documents, materials, and electronically stored information ("ESI") relevant to any issue in this case until the conclusion of this litigation.

## X.   JURY DEMAND

223. Plaintiff hereby demands a trial by jury on all issues of fact and damages set forth herein.

## XI.   PRAYER

224. Plaintiff respectfully requests that Defendants be cited to appear and answer, and that upon final trial, the Court enter judgment in Plaintiff's favor and award the following relief:

a) Back pay and front pay, including lost benefits;

b) Compensatory damages;

c) Punitive damages;

d) Injunctive and declaratory relief, including but not limited to, an Order:

   i. Prohibiting Defendants from engaging in further unlawful discrimination and retaliation;

   ii. Requiring Defendant CH to implement, maintain, and post EEO policies and anti-discrimination notices at all firm locations to ensure compliance with federal and state law;

   iii. Requiring Defendant CH to provide anti-discrimination/EEO training to all employees, whether individual contributors or management;

    iv. Requiring Defendants to report to the Court regarding compliance with any final order issued herein;

    v. Declaring that Defendants violated Plaintiff's rights under federal and state law, including but not limited to Title VII, Section 1981, and relevant state tort and equitable doctrines to which the Court has jurisdiction;

e) Awarding court costs;

f) Awarding reasonable attorney's fees and costs under federal and state law;

g) Pre-judgment and post-judgment interest at the rate set by law;

h) Awarding consequential and incidental damages caused by Defendants' conduct; and

i) All legal or equitable relief this Court deems proper.

*/s/ Marshay Iwu*
Marshay Iwu
State Bar No. 24083204
marshayiwu@lawyersdemandingjustice.com
**IWU & ASSOCIATES**
400 South Zang Boulevard, Suite 1200
Dallas, Texas 75208
Telephone: 469-804-9721
Facsimile: 214-272-3186
**ATTORNEY FOR PLAINTIFF**
